# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | |
| | ) | ID No. 2105000951 |
| JACARI ROBINSON, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: June 23, 2023
Decided: August 8, 2023

*Upon Defendant Jacari Robinson's Motion to Suppress Defendant's Statement,*
**GRANTED.**

## <u>ORDER</u>

Joseph S. Grubb, Esquire, Erika R. Flaschner, Esquire, Anthony J. Hill, Esquire Deputy Attorneys General, DEPARTMENT OF JUSTICE, 820 North French Street, Wilmington, Delaware 19801, Attorneys for the State.

Megan J. Davies, Esquire, LAW OFFICES OF MEGAN J. DAVIES, 716 North Tatnall Street, Wilmington, Delaware 19801, Attorney for Defendant Jacari Robinson.

**WHARTON, J.**

This 8th day of August 2023, upon consideration of Defendant Jacari Robinson's ("Robinson") Motion to Suppress Statement ("Motion to Suppress"),[1] the State's Response to the Motion ("State's Response"),[2] Robinson's Reply ("Robinson's Reply"),[3] the State's Letter Memorandum as its Reply ("State's Letter"),[4] Robinson's Letter in response ("Robinson's Letter"),[5] evidence adduced at a hearing held on June 23, 2023, and the record before it, it appears to the Court that:[6]

1.     On January 22, 2021, then 17-year-old Robinson was taken into custody for what he and his mother were told was a violation of probation ("VOP") for GPS ankle monitor violations.[7] Based on that information, Robinson's mother elected to remain at the residence she shared with Robinson.[8] One P&P officer transported Robinson while another remained behind with his mother.[9]

2.     Rather than being taken to Family Court for presentation to a judicial officer for the purpose of setting bail on the VOP, Robinson was transported to the New Castle County Police Department ("NCCPD") and placed in a interrogation

---

[1] D.I. 35.
[2] D.I. 38.
[3] D.I. 41.
[4] D.I. 50.
[5] D.I. 51.
[6] Only background specifically relevant to the pending Motion is discussed.
[7] Mot. Hr'g, D.I. 47.
[8] Mot. Hr'g, D.I. 47.
[9] Mot. Hr'g, D.I. 47.

1

room where he was questioned by homicide detective David DiNardo ("Det. DiNardo").[10] During this recorded interrogation, Det. DiNardo and Robinson discussed several ongoing shooting investigations, including the homicide investigation in which Robinson is charged here.[11] During that interrogation, Robinson made statements that the State intends to introduce at his trial.[12] At the time, Robinson had not been charged with any of the crimes under discussion.[13]

3. The Court received Robinson's Motion to Suppress on September 6, 2022[14] and the State's Response on October 13, 2022.[15] From there, Robinson filed his Reply on January 23, 2023,[16] the State filed its Letter on February 10, 2023,[17] triggering Robinson's Letter on February 10, 2023,[18] which was the parties' final submission. On December 13, 2022, after considering Robinson's Motion to Suppress, the State's Response, and the video recording of the interview, the Court ordered an evidentiary hearing.[19] The hearing was originally scheduled for January 27, 2023, but scheduling difficulties delayed it until June 23, 2023.[20]

---

[10] Mot. Hr'g, D.I. 47.
[11] State's Resp., at 5, D.I. 38.
[12] *Id.* at 5-7.
[13] Indictment, D.I. 2 (dated May 10, 2021).
[14] Mot. to Supp., D.I. 35.
[15] State's Resp., D.I. 38.
[16] Def.'s Reply, D.I. 41.
[17] State's Letter, D.I. 50.
[18] Def.'s Letter, D.I. 51.
[19] D.I. 39.
[20] D.I. 40; D.I. 53; Mot. Hr'g, D.I. 47.

4.      Delaware law allows peace officers to take a juvenile they believe to be delinquent into custody.[21]  However, after taking the juvenile into custody, and "grounded, in part, on a juvenile's due process and self-incrimination rights,"[22] the peace officer must "immediately notify the child's custodian citing the reasons therefor."[23]  Peace officers' failure to do so is sufficient to warrant suppression.[24]

5.      Robinson's § 1004 argument as set out in its letter of February 10, 2023 is that:

> The defense is asking the Court to require that law enforcement **follow the law that governs them.** When taking a **juvenile** into custody, the guardian should be notified of the **reasons** the juvenile is being taken into custody.[25]  Here, this would have included advising that the juvenile was being immediately transported and turned over to homicide detectives so that detectives could interview the defendant as a suspect in a homicide investigation.[26]

Robinson maintains that while the VOP may have been the legal justification for taking him into custody, the more important reason for his custody was law enforcement's admitted desire to interrogate him regarding the NCCPD

---

[21] 10 *Del. C.* §1004.

[22] *Palmer v. State*, 626 A.2d 1358, 1363 (Del. 1993)(*citing Vorhauer v. State*, 212 A2.d 886, 892–93 (Del. 1965)).  *Palmer* discusses 10 *Del. C.* §933 and Fam. Ct. R. 5(b).  Sec. §933 is now 10 *Del. C.* § 1004.

[23] 10 *Del. C.* §1004.

[24] *Palmer*, 626 A.2d at 1363 ("Deprivation of those rights is enough to warrant the suppression of [the juvenile's] statements.")

[25] Custodial notification is mandatory ("shall immediately notify"), not permissive ("should be notified").

[26] Def.'s Letter, D.I. 51.

investigations.[27]  Since 10 *Del. C.* §1004 requires disclosure of the reasons that a juvenile is taken into custody, according to Robinson, the peace officers' failure to notify his mother of this more significant reason contravenes the statute.[28]

6.      Robinson argues that the State's reliance on his mother's previous interactions with peace officers does not justify its failure to notify her of the reasons he was being taken into custody in this case.[29]  Robinson explains that his mother:

(1) believed her son was only being taken into custody for a violation of probation and would be receiving a court date, as has happened in the past …;
(2) did not learn he[] was being taken to NCCPD until well into his interview; and
(3) did not know her son was being taken in for an interview at all, let alone for any charge or investigation beyond the VOP.[30]

Relying in large part on *State v. Palmer*,[31] Robinson argues that peace officers' failure to fully notify his mother of the additional reason he was taken into custody violates 10 *Del C.* §1004, running afoul of the statute's protection of juveniles' due

---

[27] Mot. to Suppress, D.I. 35; Def.'s Reply, at 10–11, D.I. 41; Def.'s Letter, D.I. 51.
[28] Robinson also argues that peace officers intentionally mislead him and his mother. The Court need not make that finding to determine whether the requirements of § 1004 were met.
[29] Def.'s Reply, at 9, D.I. 41.
[30] Def.'s Reply, at 5, D.I. 41.
[31] 626 A.2d 1358 (Del. 1993).

process and self-incrimination rights.[32]  For these reasons, and others, Robinson argues that his statements must be suppressed.[33]

7.    The State responds that Robinson's focus on "reasons" overlooks the term "custody[.]"[34]  Specifically, it argues that "[Robinson] was taken into custody due to [a VOP].  Any secondary or simultaneous reason why law enforcement wanted to speak with him is irrelevant, as the Defendant could not have been taken into custody for any reason other than the violation."[35]  The State maintains that 10 *Del. C.* §1004 was not violated simply because "[w]hile in custody, the detectives ***took the opportunity*** to question the defendant about a variety of incidents."[36] Robinson's mother (having previous interactions with peace officers due to her sons' conduct) elected not to go to NCCPD,[37] and that "there was no ploy."[38]  It argues that officers acted appropriately in their handling of the case and that "[i]nterviewing

---

[32] Def.'s Reply, at 12, D.I. 41.
[33] Robinson contends that his *Miranda* waiver was not made knowingly and voluntarily and that Det. DiNardo did not honor his requests to terminate the interview as well.
[34] State's Letter, at 2, D.I. 50.
[35] State's Letter, at 1–2, D.I. 50.
[36] State's Resp., D.I. 38 at 16 (emphasis added).
[37] *E.g.*, State's Resp., at 4, D.I. 38 ("This was not the first time the defendant's mother was present or had been informed of an arrest. Each time defendant's mother was present or contacted, she encouraged her son to cooperate with law enforcement."); State's Resp., D.I. 38 at 15 ("The defendant's mother knew her son was taken into custody, as she had witnessed several times before, and chose to not go to NCCPD.")
[38] State's Resp., at 16, D.I. 38.

5

individuals taken into custody for a reason other than why they were in custody is a legal and ethical practice regularly employed."[39]

8.     Robinson was arrested on a VOP capias. The violation stemmed from a curfew violation reported by his mother. When probation attempted to impose the sanction of GPS monitoring on him, Robinson refused the ankle monitor. It was this refusal which resulted in the VOP capias being issued. However, at some point prior to the VOP capias being executed, the GPS monitor was placed on Robinson as he can be seen to be wearing it in the video of his interrogation. Thus, when Robinson was taken into custody, as far as his mother knew and was told by probation officers, he was to be taken to Family Court to have bail set for a VOP hearing for refusing to wear the GPS monitor he was now wearing and that she would be contacted. It would have been entirely reasonable for her to have considered Robinson's arrest to be a minor matter not requiring her presence.

9.     Robinson was not taken directly to Family Court to have bail set on the seemingly all-but-resolved VOP. Instead the arresting probation officer reached out to the NCCPD. She did so because, due to her participation in a NorthPak enforcement action team, she thought NCCPD detectives might want to talk to Robinson since he was believed to be a member of the NorthPak street gang. She

---

[39] State's Letter, at 2, D.I. 50.

thought that their might be an unexecuted DNA search warrant or a BOLO[40] notice outstanding. In fact there was no DNA search warrant, but NCCPD detectives did want to speak with Robinson. Det. DiNardo acknowledged that Robinson was brought to NCCPD at his request for questioning about other crimes.[41] As a result, the reasons for Robinson's custody changed significantly from what Robinson's mother was led to believe. Robinson was taken to a different location. He was in

---

[40] Be On Look Out.

[41] JACARI ROBINSON: I thought I got picked up for VOP because I refused to put [the ankle monitor] on.
DETECTIVE DINARDO: Yeah. And I asked them to bring you here. Why would VOP bring you to New Castle County Police Station unless I asked for you to come here? Because you have a side of the story that only you can tell.
Tr. at 73:19–30.

JACARI ROBINSON: I'm just saying, why did you let probation come get me? When people on -- when people are being looked for for murder, they -- they come and like -- y all come in that (inaudible). And I --
DETECTIVE DINARDO: There's -- there's -- there's reasons why I do. I've already turned your mom's apartment or room upside down. I don't want your mom to lose her job.
JACARI ROBINSON: Yeah.
DETECTIVE DINARDO: If probation can very respectfully bring you down here, then I'm going to do that. I -- I -- I -- believe it or not, I care about your mom, right? Her and I had a conversation back in November when we had the incident.
…
DETECTIVE DINARDO: Why would I [flip the Robinson's home] if you're on an ankle monitor and probation says, yeah, we ll pick him up for you?
JACARI ROBINSON: But like --
DETECTIVE DINARDO: And nobody gets hurt. We don't have to kick in any doors. We don't have to bring a bunch of police to your mom's hotel room and risk getting her in trouble with work. Why would I?
Tr. at 86:30–87:10, 87:35–88:5. Def.'s Reply, at n.3 and associated text, D.I. 41.

the custody of a different law enforcement agency. And, the purpose of his custody changed from being presented to a judicial officer for the purpose of setting bail to being questioned by a homicide detective about shooting investigations. His mother was advised of none of these changes. The net effect, of course, is that Robinson's mother was not fully informed of the reasons for his custody, and, therefore, was unable to make a knowing and intelligent decision as to what she should do to protect his interests.

9.      The Court finds, at a minimum, that the statute requires that law enforcement officers are required to disclose to a juvenile's custodian any material changes in the reasons the juvenile was taken into custody. The failure of law enforcement to notify Robinson's mother of these very substantial and material changes in the reasons for his custody deprived Robinson of significant rights under § 1004, "rights which are grounded, in part, on a juvenile's due process and self-incrimination rights."[42]   "Deprivation of those rights is enough to warrant suppression of his statement."[43]

10.      The argument, expressed in the State's Letter that "Any secondary or simultaneous reason why law enforcement wanted to speak to him is irrelevant, as the defendant could not have been taken into custody for any reason other than the

---

[42] *Palmer,* 626 A.2d, at 1363 (citing *Vorhauer v. State*, 212 A.2d 886-893 (Del. 1965)).
[43] *Id.*

8

violation"[44] confuses the legal justification for arresting Robinson with the purpose of the notification requirement of § 1004. The legal justification for taking Robinson into custody was the VOP. But, purpose of the requirement in § 1004 that a juvenile's custodian be notified of the reasons the juvenile was taken into custody is so that the custodian may make an informed decision about protecting the juvenile's due process and self-incrimination rights. The failure to notify Robinson's mother of the "secondary or simultaneous" reason he was taken into custody deprived her of that opportunity.

11. The Court is unpersuaded by the State's argument that it should take into account Robinson's mother's past conduct. The facts and circumstances of each custody are different and a failure of a custodian to assist a juvenile on a prior occasion cannot act as a permanent waiver to provide assistance on future occasions. It is true that Robinson's mother had previous contact with law enforcement officers stemming from her son's behavior. Here, however, the circumstances are materially different - she was only informed of his VOP with no mention that he would be interrogated about a first degree murder investigation. The Court cannot assume that her past deference to law enforcement would continue under these circumstances.

12. Similarly, the Court is unpersuaded that requiring law enforcement to notify a custodian of a substantial and material changes in the reason for a juvenile's

---

[44] State's Letter, at 1-2, D.I. 50.

9

custody fails to take into account the fluid nature of interrogations. The Court is not presented with a case where a custodian was told an interrogation was to be attempted on a given subject and the interrogation veered off unexpectedly into different areas. Here, Robinson's mother was not even told there would be an interrogation, much less afforded the opportunity to advise him whether to agree to speak to Det. DiNardo. Nor, did she have an opportunity to be present in order to avoid dangerous subjects or end the interrogation entirely.

13. Because the Court suppresses Robinson's statement on the issue of informing his custodian of the reasons for his custody, it finds it unnecessary to address Robinson's contention that his statement was not made knowingly and voluntarily for the reasons set out in his motion.

**THEREFORE,** Defendant Jacari Robinson's Motion to Suppress Defendant's Statement is **GRANTED.**

/s/ *Ferris W. Wharton*
Ferris W. Wharton, J.